# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**THOMAS R. PHIPPEN**
        **Plaintiff,**

    v.                                                                 Case No. 11-C-0955

**MICHAEL J. ASTRUE,**
**Commissioner of the Social Security Administration**
        **Defendant.**

## DECISION AND ORDER

In July of 2009, plaintiff Thomas Phippen filed with the Social Security Administration ("SSA") applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"), alleging that he became disabled beginning on January 1, 2006. An Administrative Law Judge ("ALJ") issued a partially favorable decision, finding plaintiff disabled beginning July 1, 2009 and awarding SSI as of that date. However, because plaintiff's "insured status" for DIB purposes expired on March 31, 2007, the ALJ denied the DIB claim. See Stevenson v. Chater, 105 F.3d 1151, 1154 (7th Cir. 1997) (noting that a DIB claimant must establish disability while in insured status). The Appeals Council denied plaintiff's requests to review and re-open, making the ALJ's decision the final word from the SSA on plaintiff's applications. See Shauger v. Astrue, 675 F.3d 690, 695 (7th Cir. 2012). Plaintiff now seeks judicial review of the ALJ's decision.

### I. APPLICABLE LEGAL STANDARDS

**A.**    **Judicial Review**

The court reviews an ALJ's decision deferentially, affirming if she applied the correct legal standards and supported her decision with "substantial evidence." Jelinek v. Astrue, 662

F.3d 805, 811 (7th Cir. 2011); Weatherbee v. Astrue, 649 F.3d 565, 568 (7th Cir. 2011). Substantial evidence "means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Skinner v. Astrue, 478 F.3d 836, 841 (7th Cir. 2007) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The reviewing federal court may not re-weigh the evidence or substitute its own judgment for that of the ALJ; if reasonable minds could differ over whether the claimant is disabled, the court must uphold the decision under review. Schmidt v. Apfel, 201 F.3d 970, 972 (7th Cir. 2000).

**B.    Disability Standard**

The SSA determines disability pursuant to a five-step sequential analysis. Craft v. Astrue, 539 F.3d 668, 673 (7th Cir. 2008). The first step considers whether the claimant is engaging in substantial gainful activity ("SGA"); if so, he will be deemed not disabled. The second step evaluates whether the claimant suffers from a "severe" physical or mental impairment; if not, he will be deemed not disabled. The third step compares the claimant's impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of these "Listings" the claimant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses the claimant's residual functional capacity ("RFC") and ability to engage in past relevant work; if the claimant can engage in past relevant work, he is not disabled. If the claimant cannot engage in past work, the evaluation continues to the fifth step and an assessment of whether, given the claimant's RFC, age, education, and work experience, he can transition to other work; if the claimant can engage in other work, he is not disabled. Id. at 674.

The claimant bears the burden of proof at each of the first four steps. Briscoe v.

2

Barnhart, 425 F.3d 345, 352 (7th Cir. 2005). However, if he reaches step five the burden shifts to the agency to establish that the claimant can perform other work that exists in a significant quantity in the national economy. Liskowitz v. Astrue, 559 F.3d 736, 740 (7th Cir. 2009). The ALJ may at step five either rely on the Medical-Vocational Guidelines (a/k/a "the Grid"), a chart that classifies a person as disabled or not disabled based on his age, education, work experience and exertional ability, or summon a vocational expert ("VE") to offer an opinion on other jobs the claimant can do despite his limitations. See, e.g., Herron v. Shalala, 19 F.3d 329, 336-37 (7th Cir. 1994). However, because the Grid considers only exertional (i.e., strength-related) limitations, if the claimant has significant non-exertional limitations the ALJ may use the Grid only as a "framework" for decision and must consult a VE for a more refined assessment. See Fast v. Barnhart, 397 F.3d 468, 470 (7th Cir. 2005); Luna v. Shalala, 22 F.3d 687, 691 (7th Cir. 1994); see also Liskowitz, 559 F.3d at 743.[1]

## II. FACTS AND BACKGROUND

### A. Plaintiff's Application and Supporting Materials

On July 14, 2009, plaintiff applied for DIB and SSI, alleging a disability onset date of January 1, 2006. (Tr. at 138-48.) In a disability report, plaintiff attributed his inability to work to the amputation of his right hand in 1976 and worsening carpal tunnel syndrome in his left arm. (Tr. at 237.) He indicated that he had trouble grasping things with his right hand

---

[1] As indicated, in the present case plaintiff sought both DIB and SSI. Both forms of social security benefits require that the claimant be "disabled" under the standards set forth above. The difference between the two programs is that DIB is payable only if the claimant becomes disabled while in "insured status." Blom v. Barnhart, 363 F. Supp. 2d 1041, 1043 n.1 (E.D. Wis. 2005). Insured status is generally determined pursuant to the so-called "20/40 rule," under which the claimant must have sufficient earnings in 20 of the previous 40 quarters. See 20 C.F.R. § 404.130. SSI is payable regardless of the claimant's insured status so long as he satisfies a means test. Blom, 363 F. Supp. 2d at 1043 n.1.

3

prosthesis, and that he had developed problems with his left arm due to overuse. (Tr. at 238.) He identified past work as a self-employed landscaper and handyman, as well as work through various temp services. (Tr. at 239.) He indicated that he had been diagnosed with carpal tunnel syndrome in 1993, for which he used over the counter pain medication (Tr. at 241), but that he had not seen a doctor since 2002 due to lack of funds (Tr. at 243).

In a function report, plaintiff indicated that he lived in an apartment with his brother. Regarding his daily activities, plaintiff wrote that he worked part-time performing odd jobs and helped with the household duties. (Tr. at 244.) He indicated that he had trouble sleeping due to the carpal tunnel and worry about paying his bills. (Tr. at 245.) He wrote that he had no problems with personal care (Tr. at 245), cooked his own meals, and helped with the house and yard work (Tr. at 246). In a physical activities addendum, plaintiff indicated that he could work odd jobs, mowing and cooking part-time, but that full-time jobs were not there for a person with his conditions. (Tr. at 252.) He indicated that he could sit for two hours, stand for two hours, and walk for one hour; in a day, he could sit six hours, stand four hours, and walk one hour. (Tr. at 252.)

**B.    SSA Proceedings**

Based on his earnings record, the SSA determined a date last insured of March 31, 2007. (Tr. at 150.) The SSA's records also indicated that plaintiff had previously applied for disability benefits in 2002, 1991, and 1984, being denied each time. (Tr. at 155-56.)

The SSA denied the 2009 applications initially but on plaintiff's request for reconsideration approved the SSI application as of July 1, 2009. (Tr. at 19, 70-76, 80-93, 321.) On February 18, 2010, plaintiff requested a hearing before an ALJ. (Tr. at 94.)

**C.    Hearing Before the ALJ**

On October 12, 2010, plaintiff appeared with counsel before ALJ Patricia Witkowski-Supergan. (Tr. at 33-35.) At the outset of the hearing, counsel and the ALJ discussed plaintiff's prior applications and the recent award of SSI. Because plaintiff's insured status ended on March 31, 2007, the primary issue was whether plaintiff became disabled between January 1, 2006 (the alleged onset date) and March 31, 2007 (the date last insured). (Tr. at 37.)

**1.    Plaintiff's Testimony**

Plaintiff testified that his carpal tunnel syndrome, with which he had been diagnosed in 1983,[2] had worsened in recent years, to the point where he could only work about ten hours per week. (Tr. at 39.) Plaintiff testified that in 2005 he did landscaping work, typically about twenty hours per week.[3] (Tr. at 40.) In 2006, he also worked in landscaping, about five to ten hours per week. (Tr. at 41-42.) He also did some part-time cooking/catering, about five to ten hours per month. (Tr. at 42.) He engaged in the same work activity in 2007, 2008, and 2009.[4] (Tr. at 42.) Plaintiff indicated that he currently worked about five to ten hours per week in catering. (Tr, at 44.) As part of his catering work, he did prep cooking and washed dishes. (Tr. at 44.)

---

[2] As the ALJ and counsel noted at the hearing, plaintiff apparently mis-spoke regarding the year, as the medical records indicate that he was diagnosed in 1993. (Tr. at 48.)

[3] Plaintiff indicated that he previously worked through a temp service in a cheese factory. (Tr. at 41.)

[4] The ALJ asked plaintiff to produce his tax records for the past several years, which he agreed to do. (Tr. at 43.) Those records revealed limited income from 2006 to 2009. (Tr. at 174-232.)

5

Plaintiff testified that he was unmarried, with no minor children, and lived in an apartment with his brother. (Tr. at 46.) They shared the household chores. (Tr. at 46.) He had not had surgery for his carpal tunnel syndrome. (Tr. at 48.)

Plaintiff testified that he had no trouble sitting or walking but could stand for a limited time – a couple hours – due to back pain. He received no treatment for this problem. (Tr. at 49.) He testified that his back and wrist bothered him in 2006 and 2007. (Tr. at 50.) He testified that he could lift and carry seven or eight pounds, but not repetitively. (Tr. at 50.) He also testified to having trouble sleeping, which affected his concentration at times. (Tr. at 54-55.) He further testified to issues with depression linked to his financial and employment situation. (Tr. at 55.) He indicated that he had seen a psychologist, Dr. Kores. (Tr. at 58-59.)

### 2. VE's Testimony

The VE, Ronald Raketti, classified plaintiff's past work in catering as medium, unskilled (cook's helper) or light, semi-skilled (caterer's helper); as a landscaper/groundskeeper, as medium, semi-skilled; and hand packager (the cheese factory work), as medium, unskilled. (Tr. at 59-61.) The ALJ then asked a series of hypothetical questions, assuming a person of plaintiff's age, education, and work experience. The first question assumed a person who could perform light work; frequently climb ramps and stairs, but never ladders, ropes, or scaffolds; frequently balance, stoop, and kneel, but never crouch and crawl; unable to reach overhead with the upper extremities; frequently perform gross and fine manipulation with the left arm, using the right arm as a guide and support; and had to avoiding hazards such as moving machinery and unprotected heights. (Tr. at 61.) The VE testified that such a person could not perform plaintiff's past work as a cook's helper, groundskeeper, or hand packager, but may be able to work as a cafeteria helper. (Tr. at 62.) The person could also perform other

jobs, such as parking lot attendant, office helper, and marker (pricing in a retail stockroom). (Tr. at 62.) Limited use of the right hand as a guide and support for the left would have no effect on these jobs. (Tr. at 62.) If the person had no use of the right arm, the parking lot attendant job would not be affected; the number of marker and office helper jobs would be reduced but not eliminated. (Tr. at 63.) If the person was further limited to occasional use of the left arm, the marker and office helper jobs would be eliminated but the parking lot attendant job would not be affected. (Tr. at 63.) A person limited to occasional use of the left arm could also work as an arcade attendant or carwash worker. (Tr. at 63.) If the person was further limited to work in a low stress environment, the jobs would not be affected. (Tr. at 64.)

The VE testified that employers typically tolerate twelve absences per year and permit fifteen minute morning and afternoon breaks, with a thirty minute lunch period; exceeding those limits due to impaired concentration would eliminate the identified jobs. (Tr. at 64.) If the person had to rest his left wrist for thirty minutes after using it for thirty minutes or was off task more than 25% of the time due to depression, all competitive work would be eliminated. (Tr. at 65-66.)

**D.     Medical Evidence Before the ALJ**

The treatment records submitted to the ALJ were quite limited. On July 19, 1993, plaintiff saw Dr. Patrick Murphy at the Sheboygan Clinic "with the possibility of carpal tunnel syndrome." (Tr. at 353.) Dr. Murphy indicated that plaintiff was actually diagnosed with this problem back in October of 1991, but after two months of light duty he seemed to improve and returned to full duty. Plaintiff reported working in custodial and lawn care since April, doing well until the past week when he noticed pain and tightness in his left wrist after using a hand clipper. With rest over the weekend, the pain seemed to subside, but he still did not feel ready

7

to return to work, complaining of weakness and dropping things. He also complained of shooting pains up the medial aspect of the elbow on the left side. On exam, plaintiff had full range of motion of his fingers and wrist, with good strength. Tinel's and Phalen's signs were negative.[5] Dr. Murphy assessed carpal tunnel syndrome, recurrent, and kept plaintiff off work for the next week, recommending a wrist splint and Ibuprofen. Dr. Murphy planned to recheck plaintiff in one week, expecting that he would be improved and could return to light duty. However, Dr. Murphy suspected that the sort of activity that exacerbated plaintiff's current problem would continue, such that "we may need to exclude this type of work from his job description." (Tr. at 353.)

Plaintiff returned to Dr. Murphy on July 26, 1993. Dr. Murphy indicated that he thought plaintiff possibly had an exacerbation of his carpal tunnel syndrome last time, but on "going over his history with him again today, symptoms are rather atypical." (Tr. at 353.) Plaintiff still complained of tightness in his wrist, going up the ulnar aspect of his forearm, and throbbing in his elbow, along with numbness in fingers of the left hand. On exam, plaintiff showed good strength with no consistent numbness noted. Tinel's and Phalen's were again negative. Dr. Murphy concluded: "This gentleman has had a history of carpal tunnel syndrome so it is possible this is an exacerbation but certainly the distribution of his numbness and paresthesias is quite unusual." (Tr. at 353.)

On September 8, 1993, in a "To Whom It May Concern" note, Dr. Cole Northrup, also from the Sheboygan Clinic, wrote: "Mr. Phippen in unable to do factory work, as this causes

---

[5]These are tests commonly used to diagnose carpal tunnel syndrome. See http://www.webmd.com/pain-management/carpal-tunnel/physical-exam-for-carpal-tunnel-syndrome (last visited May 10, 2012).

8

him to have carpal tunnel problems with his left wrist. However, he can do cook work full time." (Tr. at 352.)

On September 14, 1993, another doctor from the Sheboygan Clinic (whose signature is illegible) indicated that he saw and treated plaintiff on that date, and that plaintiff could return to work on that date with restrictions of light work (lifting twenty pounds maximum, ten pounds frequently, standing/walking six to eight hours in an eight hour day, and sitting five to eight hours in an eight hour day). The doctor further indicated that plaintiff could use his hands for repetitive grasping, fine manipulation, and pushing/pulling, except for his prosthetic right hand. The doctor also stated that plaintiff could use his feet for repetitive movements and could frequently bend, squat, climb, and reach. The doctor wrote that plaintiff "may cook," and that these restrictions were permanent. (Tr. at 351.)

On October 6, 1997, plaintiff saw Dr. Leonard Reedyk for a painful rash in his external ears. Dr. Reedyk assessed severe dermatitis, for which he prescribed Triamcinolone cream. (Tr. at 319.) Dr. Reedyk also suggested that plaintiff see a Dr. Wenberg regarding elevated blood pressure. (Tr. at 319.) Dr. Reedyk provided a work slip for the day, suggesting that plaintiff be re-checked the next day before returning to work in the cheese factory. (Tr. at 320.)

On August 27, 2002, plaintiff saw Dr. Nikolo Quinones at the Sheboygan Clinic regarding a cyst or lipoma on the posterior chest wall. (Tr. at 317, 320.) Dr. Quinones referred plaintiff to Dr. Charles Black. On September 10, 2002, Dr. Black assessed a lipoma on the right back, which he removed at his office under local anesthesia. (Tr. at 317-18.) Plaintiff returned to Dr. Black for follow-up on September 19, 2002, reporting no problems. (Tr. at 318.)

On September 16, 2009, Dr. Jeffrey Gaver performed a consultative disability evaluation for the state Disability Determination Bureau. (Tr. at 324.) Plaintiff reported that in 1976 he

9

lost his right hand in an industrial accident, after which he was fitted with a prosthesis. He taught himself to write with his left hand, which he now used as his dominant hand. Plaintiff further reported that in 1981 he was diagnosed with carpal tunnel syndrome by Dr. Northrup. Over the past few years, he had developed right forearm, upper arm, and shoulder pain. He further reported now having trouble doing anything that involved any kind of strength or fine motor movement with the left hand. The prosthesis on his right limb was only good for steadying an object, not for grasping. Plaintiff also reported developing low back pain due to having to compensate for reduced upper limb function. (Tr. at 324.) He further reported that his symptoms had worsened to the point where he could no longer handle the weight of the pans he used in his work as a cook. He reported ability to perform most activities of daily living but had trouble mowing the lawn, trimming, or even carrying groceries. (Tr. at 325.) Based on his examination, Dr. Gaver assessed significant median nerve deficits and carpal tunnel disease of the left arm. Given his right hand loss, Dr. Gaver found plaintiff's "ability to function . . . quite compromised." (Tr. at 331; see also Tr. at 332-33.)

On October 9, 2009, Dr. Pat Chan completed a physical RFC assessment for the SSA based on plaintiff's current condition, finding plaintiff capable of light work, with limited ability to handle (gross manipulation) and finger (fine manipulation). (Tr. at 354-57.) In the comments section, Dr. Chan wrote that plaintiff suffered a right hand amputation many years ago, after which he trained himself to become left hand dominant. However, over the past several years he developed left carpal tunnel symptoms, with reduced strength and diminished sensation, such that he had trouble doing anything with his left hand that involved any kind of strength or fine motor movement. Dr. Chan concluded that plaintiff could perform light work with occasional handling and fingering with the left hand, with no right hand use, which limited the

10

occupational base to less than sedentary employment. (Tr. at 361.)[6]

On January 25, 2010, Dr. Syd Foster prepared a physical RFC assessment for the SSA, evaluating plaintiff's condition as of the date last insured (March 31, 2007). Dr. Foster found plaintiff capable of light work, with limitations in gross and fine manipulation. (Tr. at 362-65.) In his comments, Dr. Foster reviewed the medical evidence, noting the 1993 records from the Sheboygan Clinic discussed above. Dr. Foster noted that records from the Sheboygan Clinic were requested back to 2001, with nothing referring to carpal tunnel syndrome in his left hand. Rather, the treatment notes reflected sporadic visits for acute issues only, with no regular care for the problems at issue in the disability claim. The next medical evidence regarding plaintiff's left carpal tunnel came in September 2009, when he saw Dr. Gaver for the consultative exam. Due to the amputation of the right hand, plaintiff's RFC was limited to one-arm light. The medical evidence established a diagnosis and symptoms of carpal tunnel prior to the date last insured, but that evidence – from 1993 – supported a limitation to frequent (not constant) handling and fingering with the left hand, with the treating physician indicating that plaintiff could work full-time as a cook. Given the absence of additional medical evidence prior to the date last insured, Dr. Foster found no further limitations in plaintiff's function other than stated above. (Tr. at 369.)

---

[6]On December 15, 2009, plaintiff underwent a mental status evaluation with Peter Kores, Ed.D., apparently arranged by his attorney. (Tr. at 345.) On testing, Dr. Kores found plaintiff to be of average intellectual ability with academic skills of a functional nature within the low average classification. Dr. Kores made no diagnoses under Axis I and II of the DSM-IV, with a present GAF of 65, highest in the past year 68. See Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32-34 (4th ed. 2000) (indicating that a GAF ("Global Assessment of Functioning") score between 61 and 70 is indicative of "mild" symptoms). Dr. Kores found that plaintiff could understand simple instructions and get along with people, but he would have difficulty in carrying out tasks due to the amputation of his dominant hand. He was intellectually and academically competent. (Tr. at 350.)

11

Plaintiff submitted a form from the state Division of Vocational Rehabilitation ("DVR") dated March 30, 2010, which indicated that plaintiff had been found eligible for services. The form indicated that DVR had three groups of people eligible for services: (1) those with the "most significant disability limitations," who were served first: (2) those with "significant disability limitations," who were served second; and (3) those with "no significant disability limitations," who were served third. The form indicated that plaintiff fell in category 2. (Tr. at 309.) However, the form did not list any specific vocational limitations or reference any specific medical evidence. Plaintiff also submitted to the ALJ a copy of his September 21, 2010, DVR individualized plan for employment. This report did not list specific limitations but rather discussed plaintiff's goals and objectives in finding work. (Tr. at 371-73.)

### E.    ALJ's Decision

On January 21, 2011, the ALJ issued a partially favorable decision, approving the SSI claim as of July 1, 2009, but denying the DIB claim. (Tr. at 15-28.) The ALJ found that plaintiff met the insured status requirements through March 31, 2007, and that he had not engaged in SGA since January 1, 2006, the alleged disability onset date. (Tr. at 22.) The ALJ noted that plaintiff worked after the onset date, but that this work activity – between five and ten hours of landscaping and another five to ten hours of catering each week – did not rise to the level of substantial gainful activity. (Tr. at 22.) The ALJ found that since the alleged onset date plaintiff suffered from the severe impairments of carpal tunnel syndrome of the left upper extremity and status post-traumatic limb amputation in 1976 (Tr. at 22), neither of which met or equaled a Listing (Tr. at 23).

The ALJ then determined that, from January 1, 2006 through June 30, 2009, plaintiff retained the RFC for light work; with no more than frequent balancing, stooping, kneeling,

climbing of ramps or stairs, handling (gross manipulation) with both upper extremities (with the right arm being used as a guide for the left), or fingering (fine manipulation) with the left arm; and no climbing of ladders, ropes, or scaffolds, crouching, crawling, overhead reaching with either arm, or exposure to hazards (such as moving machinery or unprotected heights). (Tr. at 23.) In making this finding, the ALJ rejected plaintiff's claims of greater limitations, noting that he continued to work as a landscaper and caterer, albeit not at the SGA level, while experiencing the same symptoms and conditions he alleged were disabling since January 1, 2006. (Tr. at 24.) The ALJ further noted that plaintiff's doctors released him to return to full-time work. Specifically, on September 8, 1993, Dr. Northrup indicated that while plaintiff could no longer engage in factory work, he was capable of full-time employment as a cook. On September 14, 1993, another doctor at the same clinic opined that plaintiff was capable of light work. There was nothing further in the record before the ALJ from treating physicians relating to plaintiff's carpal tunnel syndrome or right hand amputation, and plaintiff admitted that he had not visited a doctor since 2002. (Tr. at 25.) The ALJ thus found no evidence of any work preclusive limitations prior to July 1, 2009. While there was evidence that plaintiff experienced numbness and other symptoms in 1993, Dr. Murphy noted that "certainly the distribution of his numbness and paresthesias is quite unusual." (Tr. at 25.) Absent this statement, the record contained nothing else in terms of objective clinical or diagnostic findings indicating or confirming a diagnosis of carpal tunnel syndrome until the consultative exam in September 2009. The ALJ noted that to the extent that one could infer that plaintiff's condition would worsen over time with consistent use of the left hand, any such inference was undermined by plaintiff's own testimony regarding his work and daily activities. (Tr. at 25.)

The ALJ thus concluded that, based on the well-supported opinion from the state agency

13

medical consultant, Dr. Foster, that plaintiff would have been able to perform light work (with additional limitations regarding the use of upper extremities and avoidance of hazards) from January 1, 2006 through June 30, 2009. The ALJ noted that the only opinions from treating doctors in the record were from September 1993, and they found plaintiff capable of full-time, light work. The only other possible "opinion" evidence came from the DVR report, in which plaintiff was noted to have "significant disability limitations." (Tr. at 25.) The ALJ considered this report under SSR 06-3p but found that it failed to set forth the specific medical evidence on which it was based or to describe in more detail plaintiff's vocational capabilities. (Tr. at 25.)

The ALJ found that plaintiff had no past relevant work, as he had never earned enough to qualify any of his past jobs as substantial gainful activity, and so proceeded to step five regarding the period prior to July 1, 2009. (Tr. at 26.) Relying on the VE's testimony, the ALJ determined that plaintiff could perform other jobs, including parking lot attendant, office helper, and marker, and thus concluded that plaintiff was not disabled prior to July 1, 2009. (Tr. at 26-27.)

However, the ALJ noted that during his September 16, 2009 consultative examination with Dr. Gaver, plaintiff exhibited significantly diminished grip strength, motor function, and range of motion in his left upper extremity. Dr. Gaver found that plaintiff had significant median nerve deficits and carpal tunnel in his left hand, and concluded that plaintiff's ability to function was quite compromised. The ALJ gave great weight to this report, finding that plaintiff was limited to less than sedentary work as of July 1, 2009, the application date for SSI benefits. (Tr. at 27.) The ALJ noted that Dr. Gaver's conclusion was supported by Dr. Chan, who also concluded that plaintiff was currently limited to less than sedentary employment. (Tr. at 27.) Given the RFC for less than sedentary work as of July 1, 2009, and considering plaintiff's age

14

(fifty-three), education, and work experience, the ALJ found that no jobs existed that plaintiff could perform beginning on that date. (Tr. at 27.) The ALJ thus found him disabled as of that date pursuant to Grid Rule 201.12. However, the ALJ found plaintiff not disabled at any time prior to June 30, 2009, including March 31, 2007, the date last insured. (Tr. at 28.)

F.    **Appeals Council Proceedings**

On January 31, 2011, plaintiff requested review by the Appeals Council. (Tr. at 14.) On May 4, 2011, the Council denied the request. (Tr. at 9-11.) Plaintiff then requested that the Council explain its decision, which the Council construed as a request to reopen the matter. On July 19, 2011, the Council declined to reopen, noting the lack of objective medical evidence supporting an onset date earlier than July 1, 2009. The Council noted that plaintiff stated in his disability report that he had not seen a doctor since 2002, and that the medical opinions of record prior to the onset date of January 1, 2009 found plaintiff capable of full-time, light work. The Council further noted the lack of medical evidence confirming a diagnosis of carpal tunnel syndrome prior to the consultative exam in September 2009. (Tr. at 6.)

On July 29, 2011, plaintiff again requested that the Council re-open the matter, submitting additional medical evidence in support of the request. (Tr. at 374-75.) According to those records, on July 26, 1993, Dr. Murphy ordered a repeat EMG to diagnose plaintiff's problem. (Tr. at 376.) The test was conducted on August 5, 1993, and on August 11, 1993, plaintiff saw Dr. Northrup in consultation. (Tr. at 376.) Dr. Northrup indicated that plaintiff had been doing custodial work since April 1993, and in May began experiencing numbness and tingling in his left hand. He had a similar problem in 1991, which resolved with splinting. He had been using a splint and Ibuprofen for his current problem, but symptoms persisted. Plaintiff also worked as a cook, which did not aggravate his symptoms, but he had not been

15

working at all since mid-July; despite rest, his symptoms persisted. On exam, Dr. Northrup noted a positive Tinel's sign over the ulnar nerve, and the EMG showed mild carpal tunnel syndrome. Dr. Northrup provided an injection, with plaintiff to return in one week for follow-up. Plaintiff returned on August 18, 1993, still experiencing symptoms of carpal tunnel syndrome. They discussed surgical correction, but plaintiff decided to resign from his custodial job to pursue a less physically demanding cooking job for which he was trained. He was to return as needed. (Tr. at 376.) Plaintiff argued that these records constituted new and material evidence (Tr. at 375), but on September 21, 2011, the Council again denied his request for review (Tr. at 1). The Council noted that while the new medical records indicated that plaintiff was diagnosed with left carpal tunnel syndrome in 1993, that was almost thirteen years prior to the alleged onset date and thus had no bearing on the claim of disability beginning on January 1, 2006. (Tr. at 2.) The Council therefore permitted the ALJ's decision to stand as the final decision of the Commissioner on plaintiff's applications. (Tr. at 1.)

### III. DISCUSSION

In this court, plaintiff argues that the ALJ erred in finding him able to work between January 2006 and July 2009. He contends that the ALJ, after finding him disabled as of July 1, 2009, improperly relied on the VE to identify hypothetical jobs he could have performed in the past, i.e., between 2006 and 2009. Vocational experts, plaintiff states, are generally asked about the future, not the past. However, ALJs are required to consider past ability to work in cases such as this one, where the DIB claimant files his application after the date last insured. See Martinez v. Astrue, 630 F.3d 693, 699 (7th Cir. 2011) (holding that, even if she was currently disabled, a claimant who applied in 2004 could obtain benefits only if she established disability prior to the end of 2003, when her disability coverage ended). The ALJ's reliance on

the VE to identify jobs during the relevant time was not improper.

Plaintiff further contends that the tax returns he submitted to the ALJ showed that he could not perform SGA during the relevant time. Limited earnings do not constitute conclusive evidence of disability. See 20 C.F.R. § 404.1574(a)(1) ("[T]he fact that your earnings were not substantial will not necessarily show that you are not able to do substantial gainful activity."); see also Hovenga v. Astrue, 715 F. Supp. 2d 848, 866 (N.D. Iowa 2010) (affirming ALJ's reliance on spotty work history to deny claim). Plaintiff's argument that the tax records demonstrated inability to perform his past relevant work also misses the mark; the ALJ found that plaintiff had no past relevant work and thus proceeded to deny the claim at step five.

Plaintiff argues that the ALJ's findings that he had no past relevant work and did not engage in SGA from 2006 to 2009 contradicts her finding regarding jobs he could have performed in the past (from 2006 to 2009). There is no contradiction. As indicated above, that plaintiff did not work at SGA levels during these years does not mean that he was disabled. Further, the ALJ appropriately relied on plaintiff's work activities from 2006 to 2009 as evidence of his capacity and in evaluating his credibility. See Jesse v. Barnhart, 323 F. Supp. 2d 1100, 1106 (D. Kan. 2004) (holding that the ALJ properly considered that the claimant actually worked after the alleged disability onset, even though that work did not rise to SGA levels). The ALJ also noted that plaintiff worked at the same level prior to 2006, despite the presence of similar symptoms before the alleged onset date. See Johnson v. Barnhart, 449 F.3d 804, 807 (7th Cir. 2006) (approving the ALJ's reliance on the claimant's ability to continue working for several years after being diagnosed). As the ALJ noted, the record contains no medical evidence supporting the contention that plaintiff's condition materially worsened around January 2006, and plaintiff admitted that he saw no doctors from 2002 until September 2009.

(Tr. at 25.) A social security claimant bears the burden of demonstrating disability, Allord v. Astrue, 631 F.3d 411, 416 (7th Cir. 2011), and in this case plaintiff presented no medical evidence from the relevant time period.

Plaintiff next argues that the state agency physician was not asked and did not offer an opinion on his ability to work prior to July 1, 2009. Therefore, he claims, there is no medical support for the ALJ's decision regarding this time frame. Plaintiff is incorrect. As the ALJ noted, Dr. Foster found that plaintiff retained the ability to work prior to the date last insured.[7] (Tr. at 25, 362-69.) The ALJ also cited records from the Sheboygan Clinic prior to the date last insured, which indicated that plaintiff could engage in full-time, light work. (Tr. at 25, 351-52.) The ALJ was not required to ignore this evidence and find plaintiff disabled based on his testimony and part-time employment history between 2006 and 2009. See 20 C.F.R. § 404.1529(a) (explaining that statements about pain or other symptoms will not alone establish disability; there must also be supporting medical evidence).

Finally, plaintiff points to the medical records he submitted to the Appeals Council in July 2011, specifically, the August 1993 notes in which Dr. Northrup diagnosed carpal tunnel syndrome and discussed surgery. Plaintiff contends that these records demonstrate how severe his left wrist condition was prior to the date last insured. However, these notes from Dr. Northrup were not submitted to the ALJ, so I may not rely on them to reverse her decision. See Rice v. Barnhart, 384 F.3d 363, 366 n.2 (7th Cir. 2004) ("Because the Appeals Council eventually refused Rice's request to review the ALJ's unfavorable decision, we note that it is not appropriate for us to consider evidence which was not before the ALJ, but which Rice later

---

[7]As indicated above, the SSA asked Dr. Chan to evaluate plaintiff's current condition and Dr. Foster to consider plaintiff's condition as of the date last insured.

18

submitted to the Appeals Council (or any argument based upon such evidence)."); Diaz v. Chater, 55 F.3d 300, 305 n.1 (7th Cir. 1995) ("We have held that, when the Appeals Council has denied review, evidence submitted for the first time to the Council, though technically a part of the administrative record, cannot be considered in determining the correctness of the ALJ's decision."); Eads v. Sec'y of the Dep't of Health & Human Servs., 983 F.2d 815, 817 (7th Cir. 1993) (noting that the correctness of an ALJ's decision depends on the evidence that was actually before her). In Diaz, the Seventh Circuit noted that the court may conduct a limited review of newly submitted evidence when a claimant alleges that the Appeals Council's refusal to review the ALJ's decision was based on a mistake of law. 55 F.3d at 305 n.1. However, plaintiff makes no such argument here.[8] Further, in this case as in Diaz, the Appeals Council treated the newly submitted evidence as a part of plaintiff's request to reopen his case. (Tr. at 1.) "Because a decision whether to reopen a case is not subject to judicial review, the additional evidence accompanying the petition to reopen similarly cannot be considered." Id. (internal citations omitted). Nor does plaintiff argue that these notes support a remand under 42 U.S.C. § 405(g), sentence six. See Perkins v. Chater, 107 F.3d 1290, 1296 (7th Cir. 1997) (explaining that a sentence six remand is appropriate if the plaintiff shows that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding). The Commissioner raised all of these objections to consideration of this evidence in his response brief. Plaintiff filed no reply.[9]

---

[8]As discussed above, the Council considered the new evidence but found that it did not provide a reason for changing the ALJ's decision. (Tr. at 2.)

[9]Although I could decline to address the issue further, I note that there is no indication in the record that the 1993 notes from Dr. Northrup were not in existence or available to plaintiff at the time of the administrative proceeding. See Perkins, 107 F.3d at 1296. Nor can I see any

19

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **AFFIRMED**, and this case is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 11th day of May, 2012.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge

---

reasonable probability that the ALJ would have reached a different conclusion had this evidence been considered. See id. On September 8, 1993, less than a month after he created the notes at issue, Dr. Northrup wrote that plaintiff "can do cook work full time." (Tr. at 352.) A second physician from the Sheboygan Clinic rendered a similar opinion on September 14, 1993. The ALJ considered these opinions in her decision. I further note for the sake of completeness that the ALJ in this case used the "template" credibility language criticized by the Seventh Circuit in Bjornson v. Astrue, 671 F.3d 640, 644-45 (7th Cir. 2012). (Tr. at 24.) However, the ALJ did go on to provide more specific reasons for her determination. In any event, plaintiff does not raise this as error, so the issue is waived.